# IN THE COURT OF APPEALS OF IOWA

No. 17-0673
Filed July 5, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KASHENNA NICHOLE TUCKER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Wapello County, Daniel P. Wilson, Judge.

Kashenna Tucker appeals her conviction for child endangerment resulting in death. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Nerissa N. Jennisch, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered by Vogel, P.J., Doyle, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**VOGEL, Presiding Judge.**

Kashenna Tucker appeals her conviction for child endangerment resulting in death. She argues the evidence is insufficient to prove she knowingly acted in a manner that created a substantial risk to the decedent's safety. We find the evidence is sufficient to support her conviction, and we affirm.

## I.    Background Facts and Proceedings

In January 2014, Tucker lived in Ottumwa with W.E, who was born in January 2011.[1] Tucker met W.E.'s mother in Chicago, and Tucker agreed to temporarily act as caretaker for W.E. Even though Tucker and W.E. were unrelated, she referred to W.E. as her nephew.

In a series of interviews with investigators, Tucker said she left W.E. with her friend Latisha Johnson for a few hours on Sunday, January 19, 2014. Johnson, although uncertain of the date, testified W.E. was "real quiet" when she watched him but he ate that afternoon and otherwise seemed normal at the time. In her interview, Tucker said she took W.E. to a park later that day where he fell down a series of concrete steps. Tucker said W.E. cried and complained that his "tummy" hurt after the fall and she took him home. She noticed a scrape on his eye and a bump on his head from the fall. She said on Monday he stayed in bed and complained his tummy hurt, but she thought "it was something that I could handle." That Monday, she scheduled an appointment at their usual medical clinic for W.E. to be seen on Thursday, January 23.

---

[1] Tucker also lived with her son, who was also three years old at the time.

Tucker told investigators that when W.E. woke on Tuesday, January 21, she made him stand up and move around, at which point he began throwing up "brown, red vomit" that appeared to contain blood. She said she called the medical clinic and asked for an earlier appointment, but they said they could not see him sooner and she should take him to the emergency room. Tucker's phone showed she called the clinic at 8:07 that morning. Her phone also showed she received a call from and exchanged five texts with an unidentified person around 10:00 that morning. She sent one text at 10:04 that said, "Im home." Investigators later found receipts inside a shopping bag in Tucker's home. The receipts show purchases from two separate Ottumwa stores on Tuesday morning at 9:38 and 9:48. The items purchased include bath tissue, moist wipes, baking soda, and ointment. The items were purchased using debit cards that match the last four digits of cards in Tucker's name. She said she tried cleaning the vomit that morning. Investigators later found several stains that appeared to be brown vomit throughout her home, including on carpet and hard flooring in several locations, on tissues in the trash, and on unwashed children's bedding inside a washing machine.[2] Some of the stains on the carpet were covered with baking soda, and there was a mop with a bucket and water in the kitchen.

Around noon on Tuesday, January 21, Tucker brought W.E. into the emergency room in Ottumwa. He had minor, inefficient breathing and no pulse. Medical staff performed CPR for forty-five minutes before he regained a pulse, at which point they arranged to transport him to the University of Iowa Hospitals and

---

[2] The record contains several photographs of the stains in Tucker's home.

Clinics (UIHC) in Iowa City for advanced care. At 2:38, Tucker told her boyfriend via text message, "if im arrested please come iowa city." W.E. remained in the Ottumwa emergency room for a couple of hours and showed some improvement before being airlifted to UIHC later that afternoon. During the flight to Iowa City, he lost his pulse around 3:55. Staff continued providing emergency care in the air and at UIHC. He never regained a pulse at UIHC, and he was pronounced dead at 4:45 that afternoon.

W.E.'s emergency physician at UIHC noted bruises and abrasions across his head, which led him to be concerned W.E. had suffered a head injury. The physician also noted W.E.'s bruises were different colors in different locations, which suggested they resulted from non-accidental injuries occurring at multiple times. On January 23, a full autopsy was performed, and W.E.'s cause of death was determined to be "[a]cute peritonitis due to duodenal perforation due to blunt force injuries of the abdomen." Peritonitis is an infection of the lining of the abdomen, which typically results from an abdominal injury. W.E.'s duodenum, a part of the small intestine, had a hole that allowed his bowel contents to enter his abdominal cavity. W.E. had internal bruising that suggested his abdominal injuries resulted from a single impact. Dr. Dennis Firchau, who performed the autopsy at UIHC, determined W.E.'s death was a homicide, opining, "the abdominal injuries that resulted in the peritonitis were highly unlikely to be from an accidental cause and were most likely the result of an inflicted injury."

Investigators interviewed Tucker multiple times in the days and weeks following W.E.'s death. Police eventually arrested her in Utah in December 2015 and charged her with first-degree murder and child endangerment resulting in

death. After waiving her right to a jury trial, the matter was tried to the district court on January 3, 2017. Among the State's witnesses were Dr. Charles Jennissen, who treated W.E. at UIHC:

> Q. Is peritonitis something that you would die from immediately upon receiving the injury that caused the tear in the intestine? A. No.
>
> Q. How does it progress? A. Well, once there is entry of bacterial content into the peritoneum, over time, there can be a reaction to that. And increasing numbers of growth of bacteria, and then inflammation of the lining, and the mesentery, the lining of the intestines related to this, you know, bacterial content from the bowel that's now in the abdomen, which is not normally there. And this can cause increasing inflammation, abdominal pain. And typically for that then, if you have a child with appendicitis and has peritonitis, they are complaining of abdominal pain and have findings on exam. And often, that needs to be treated with antibiotics or surgery. So to die from that, you usually would have to have a progressive infection that's getting worse and worse over a period of time, perhaps even days. And then the patient has bacteria that enters into the blood stream causing sepsis. Eventually, a decrease in blood flow from the septic shock. And so a decrease in blood flow to the brain, the heart, other vital organs causing eventually, cardiopulmonary arrest. So this isn't something that happens over, you know, a sudden period of time. This is something that happens over a period of time.
>
> Q. Is it fair to say that not treated, and it results in death, that it would be a long and painful death? A. It would be very uncomfortable. Now eventually a child might become very, not lucid because they're not getting enough blood flow to the head. But yes, it would eventually be very painful and discomforting. Anyone seeing that child would say this child is sick. They need to be seen. And they need to be taken care of.
>
> Q. And when you say this child is sick, could it be easily thought that it was just a flu or something simple like that? Or would it be more obvious? A. Well, you know, initially, these might not have been very significant as far as the symptoms that they have. But as peritonitis develops and as they have worsening symptoms and then perhaps developing into septic shock, it would have been clear and clearer this child was not very responsive and is getting sicker and sicker.

The State also presented testimony from Dr. Firchau:

> Q. What is the progression of [peritonitis]? I mean, once the perforation occurs, does everything happen right away? Or is it a

slow progression?   A.  Usually not.  Usually it takes some time depending on the size of the defect and the amount of material in the area where the defect was.  It takes some time for the contents to spill and then the inflammation to begin and spread.  And again, there could be some variability.  But this is a process that generally takes some time.  And usually there's often, or not uncommonly, there is a period where an individual is quite symptomatic with your symptoms of pain, nausea, vomiting, and very likely a fever prior to becoming more medically unstable.

Q. Is it unusual for it not to be caught before someone dies from it?   A.  It usually presents itself clinically.  So the person who has it will generally know that there's something wrong.  And if the person has, let's say an adult who has the ability to make decisions for him or herself, it would be their choice to seek medical intervention or not.  Or inform somebody else.  But generally, there is some time where it's quite clinically pronounced where people would often seek medical intervention or medical assistance for this.

On February 3, 2017, the court entered its verdict.  Regarding the count of murder in the first degree, the court found a lack of evidence Tucker committed a violent act that caused W.E.'s injuries, and it found her not guilty of murder. Regarding the count of child endangerment resulting in death, the court found Tucker had custody or control of three-year-old W.E. during the period at issue, and she knowingly acted in a manner that created a substantial risk to the physical health or safety of W.E., which resulted in W.E.'s death.  Therefore, the court found her guilty of child endangerment resulting in death.  The court sentenced her to incarceration for no more than fifty years.

Tucker now appeals.  She argues the evidence is insufficient to prove she knowingly acted in a manner that created a substantial risk to the W.E.'s safety.

## II.     Standard of Review

We review claims of insufficient evidence for correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).  In doing so, we view the evidence "in the light most favorable to the State."  *Id.*  "[W]e will uphold a verdict

if substantial record evidence supports it." *Id.* "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* The factfinder is "free to reject certain evidence, and credit other evidence." *Id.*

### III. Analysis

"When [a sufficiency-of-the-evidence] claim is made on appeal from a criminal bench trial, error preservation is no barrier." *State v. Anspach*, 627 N.W.227, 231 (Iowa 2001).

The district court convicted Tucker of child endangerment resulting in death under Iowa Code section 726.6(1)(a) (2014) ("A . . . person having custody or control over a child . . .commits child endangerment when the person . . . [k]nowingly acts in a manner that creates a substantial risk to a child or minor's physical, mental or emotional health or safety."). As used in the statute, "'act' includes a failure to do any act which the law requires one to perform." Iowa Code § 702.2. Additionally, "knowingly" means "the defendant acted with knowledge that [he or] she was creating substantial risk to the child's safety." *State v. Leckington*, 713 N.W.2d 208, 214 (Iowa 2006).

Tucker argues the evidence does not support a conclusion that, prior to W.E.'s death, she acted with the required knowledge that she was creating substantial risk to W.E.'s safety. *See id.* At most, she asserts the evidence shows she should have known of the risks.

Tucker is correct that the record shows she should have known W.E.'s deteriorating and dire condition. Dr. Jennissen testified about the progression of peritonitis and the resulting pain, which would cause "[a]nyone seeing that child

[to] say this child is sick. They need to be seen." Similarly, Dr. Firchau testified advanced peritonitis is generally "quite clinically pronounced where people would often seek medical intervention or medical assistance."

Beyond this general medical evidence of the obvious distress accompanying peritonitis, the record contains sufficient evidence specific to the gravity of W.E.'s condition. Tucker described W.E. as clearly ill the entire day before his death. By the morning of his death, W.E.'s health had declined significantly as he repeatedly vomited blood throughout the home. The investigators' testimonies and evidentiary photographs show the volume and spread of the vomit. Tucker's statements to investigators—made hours after W.E.'s death—show she thought the vomit contained blood at the time. She knew about the bloody vomit no later than 8:07 that morning when she called the clinic. While her attempt to seek medical attention was appropriate, she ignored the clinic's advice to seek emergency care. Instead, she apparently left home to purchase cleaning supplies and other items,[3] talked and texted on her phone when she returned home, and began cleaning. Finally, she brought W.E. into the emergency room when he had no pulse and was near death. That occurred around noon, about four hours after she called the medical clinic and was advised to take W.E. to the emergency room. W.E.'s bloody vomit and deteriorating condition clearly showed he needed immediate medical care, and Tucker's decision to delay emergency care for about four hours—if not longer—after she

---

[3] The record does not explain who, if anyone, watched W.E. while Tucker was shopping.

found him listless and vomiting blood, provides sufficient evidence that she acted with the required knowledge of creating a substantial risk to his safety. *See id.*

We recognize the evidence could have supported a different verdict. W.E.'s symptoms of stomach pains and vomiting are consistent with many non-serious childhood illnesses. Tucker repeatedly told investigators she did not know the severity of the situation and she thought she could handle it. However, contradictory evidence does not render other evidence insufficient. *See Sanford*, 814 N.W.2d at 615. Sufficient evidence supports the knowledge element under Iowa Code section 726.6(1)(a). Therefore, we affirm her conviction for child endangerment resulting in death.

**AFFIRMED.**